UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TOMMY COOK,
 Plaintiff,

 v.           CIVIL ACTION NO.
             17-11764-IT

NANCY A. BERYYHILL, Acting
Commissioner of the
Social Security Administration,
 Defendant.[1]

**REPORT AND RECOMMENDATION RE:**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 13);**
**DEFENDANT'S MOTION FOR ORDER AFFIRMING THE DECISION OF THE**
**COMMISSIONER (DOCKET ENTRY # 17)**

**August 13, 2018**

**BOWLER, U.S.M.J.**

 Pending before this court are cross motions by the parties, plaintiff Tommy Cook ("plaintiff") and defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration ("the Commissioner").  Plaintiff seeks summary judgment and an order reversing the decision of the Commissioner under 42 U.S.C. § 405(g).  (Docket Entry # 13).  The Commissioner moves for an order affirming her denial.  (Docket

---

[1]  Nancy A. Berryhill succeeded former defendant Carolyn W. Colvin as the Acting Commissioner of Social Security.  Under Fed. R. Civ. P. 25(d), Colvin's successor is automatically substituted as the defendant in this suit.

Entry # 17).  After conducting a hearing, the court took the
motions (Docket Entry ## 13, 17) under advisement.

<u>PROCEDURAL HISTORY</u>

On March 7, 2014, plaintiff filed a Title II application
for a period of disability and disability insurance benefits.
(Tr. 144-146).[2]  Therein, plaintiff alleged disability as of
August 30, 2009.  (Tr. 233).

On May 24, 2016, an administrative law judge ("ALJ")
conducted a hearing.  (Tr. 49).  Both plaintiff and a vocational
expert ("VE") testified at the hearing.  (Tr. 50).  The ALJ
concluded plaintiff was not disabled, and denied the claim for
disability benefits on August 31, 2016.  (Docket Entry # 1-1, p.
2).  The Appeals Council denied review on July 18, 2017, thereby
affirming the ALJ's decision.  (Tr. 1).  Plaintiff filed this
action thereafter on September 15, 2017.  (Tr. 1).

In the case at bar, plaintiff contends that the ALJ did not
give proper weight to the testimony of Henry Toczylowski, Jr.,
M.D. ("Dr. Toczylowski").  (Docket Entry # 14).  Plaintiff
further contends that the ALJ misstated Dr. Toczylowski's
statements and inaccurately summarized pertinent facts
concerning both the description and the course of plaintiff's

---

[2]  "Tr." refers to the page number in the lower right corner of
the administrative record (Docket Entry # 12).

2

injuries.  (Docket Entry # 14).  The Commissioner acknowledges
the existence of a few errors by the ALJ, but maintains that
these errors were immaterial and did not undermine the ALJ's
determination.  (Docket Entry # 18).

<u>FACTUAL BACKGROUND</u>

On February 22, 2007, while working as a truck driver,
plaintiff fell and injured his right shoulder while climbing
into his truck.  (Tr. 519).  The precipitation of this injury,
coupled with a number of independent afflictions, forms the
substance of this dispute.

I.   <u>Plaintiff's Age, Education, and Work History</u>

Plaintiff, born in 1967, was 46 years old at the time of
the application for benefits.[3]  (Tr. 56).  He has a twelfth grade
education and has attended truck driving school.  (Tr. 56).
Plaintiff has past relevant work experience as a truck driver.[4]
(Tr. 56).

II.  <u>Medical Record Evidence</u>

---

[3]  At the time of the ALJ hearing, plaintiff was 49 years old.
(Docket Entry # 1-1, p. 2)(Docket Entry # 14, p. 1).
[4]  The Dictionary of Occupational Titles ("DOT") defines truck
driver (light) as driving a truck with a capacity under three
tons to transport materials, merchandise, equipment, or people.
<u>DOT</u> 906.683-022.  The DOT defines truck driver (heavy) as
driving a truck with a capacity of more than three tons to
transport materials, merchandise, equipment, or people.  <u>DOT</u>
905.663-014.

Plaintiff first visited Dr. Toczylowski, an orthopedic surgeon at Longwood Orthopedic Associates, Inc., about a shoulder issue on March 19, 2007.  (Tr. 512).  Plaintiff complained of significant difficulty during the initial evaluation and could only flex his right shoulder to "90 degrees with 90 degrees of abduction."  (Tr. 512).  Under the direction of Dr. Toczylowski, plaintiff had an MRI on April 4, 2007, which revealed "supraspinatus tendinopathy" and "subtle T2 hypertensity traversing the full-thickness of the supraspinatus tendon."  (Tr. 453).  There was not, however, a full tear of any shoulder tendon.  (Tr. 486).  The attending physician who reviewed the MRI noted there was a slight possibility of "a very subtle full-thickness supraspinatus tear without tendon retraction or muscle atrophy" and recommended "further evaluation."  (Tr. 486).  A separate MRI arthrogram on June 8, 2007 noted degenerative changes to the shoulder and a full-thickness distal supraspinatus tear.  (Tr. 453, 484, 488).  As a result, Dr. Toczyloskwi performed an arthroscopy with a decompression and repair of plaintiff's right shoulder on August 7, 2007.  (Tr. 375, 397, 453).

Despite the operation, plaintiff remained symptomatic and, on October 29, 2007, he had another MRI arthrogram.  (Tr. 453, 481-482).  The MRI indicated further degenerative changes and recurrent tearing.  (Tr. 482).  On February 29, 2008, Dr.

4

Toczylowski performed a second arthroscopy and repaired
plaintiff's torn rotator cuff.  (Tr. 332-333, 469, 471, 506).
In a follow-up appointment on March 10, 2008, plaintiff was able
to abduct his arm to 90 degrees and flex forward to about 110
degrees.[5]  (Tr. 471).  Thereafter, plaintiff progressed with
physical therapy ("PT").  (Tr. 471).

     During a June 9, 2008 visit to Dr. Toczylowski, plaintiff
demonstrated good range of motion ("ROM"), but reported a
"catching sensation" in his shoulder when moving his arm down
from a forward flexed position to a horizontal position.  (Tr.
450).  On June 16, 2008, another MRI indicated an "interval post
acromioplasty change" and a "stable partial undersurface
[tendon] tear" to plaintiff's right shoulder.  (Tr. 335, 479).
Dr. Toczylowski, however, "did not detect a full thickness tear
or other major pathology" and did not see any new tears based on
the MRI results.  (Tr. 467).

     During a physical examination on June 17, 2008, Dr.
Toczylowski noted that plaintiff had "good forward flexion,
abduction to 90 degrees with 90 degrees of external rotation and
an occasional catching sensation."  (Tr. 467).  On July 21,

---

[5]  "Abduction" is "[a] movement whereby one part is drawn away
from the axis of the body or of an extremity."  Blakiston's
Gould Medical Dictionary (4th ed. 1979).

2008, Dr. Toczylowski administered a hydrocortisone injection into plaintiff's right shoulder.  (Tr. 449).

By late September of 2008, plaintiff had "good forward flexion with 90 degrees of abduction and nearly 90 degrees of external rotation and 4+ to 5/5 strength."  (Tr. 514, 688). During a visit to Dr. Toczylowski on September 28, 2008, plaintiff stated that his shoulder was "bothering him intermittently over an extended period of time."  (Tr. 448).  As a result, Dr. Toczylowski prescribed Ultram for the pain.  (Tr. 448).

In March of 2009, plaintiff reported doing "reasonably well," but still maintained that there was a continued intermittent catching sensation in his right shoulder.  (Tr. 448).  Dr. Toczylowski noted, however, that plaintiff had good forward flexion, abduction, external rotation and strength. (Tr. 448).  Dr. Toczylowski administered another hydrocortisone injection and informed plaintiff that he should continue to work on his range of motion and strength.  (Tr. 448).  An MRI performed on October 14, 2009 revealed the repair to plaintiff's right shoulder was "intact," with "minimal residual tendinopathy."  (Tr. 434).

On December 14, 2009, plaintiff met with Dr. Toczylowski and complained of having "considerable difficulty with his shoulder."  (Tr. 447).  An MRI, however, showed that plaintiff's

rotator cuff was "intact with an intact repair." (Tr. 447).
Plaintiff also complained of a catching sensation that occurred
when moving his right shoulder up and down. (Tr. 447). It was
further noted that plaintiff had good strength. (Tr. 447). Dr.
Toczylowski decided to administer an injection, this time with
40mg. of DepoMedrol and 0.5% Marcaine, to plaintiff's anterior
lateral deltoid. (Tr. 447).

Plaintiff visited Dr. Toczylowski six months later on July
26, 2010, complaining of "popping and cracking as well as
significant, intermittent pain and weakness in the shoulder."
(Tr. 445). During this visit, Dr. Toczylowski noted that
plaintiff was able to "forward flex, with a great deal of
discomfort." (Tr. 445). The physical examination also revealed
that plaintiff had tenderness and a slight defect in the deltoid
area where he had surgery previously. (Tr. 445). Dr.
Toczylowski further noted that, although plaintiff had 4+/5
strength, which was less than the previous physical examination,
plaintiff had overall "good strength." (Tr. 445). Moreover,
plaintiff did "not have any tenderness over the anterior aspect
of the shoulder or posteriorly." (Tr. 445).

A right shoulder arthrogram performed on August 19, 2010,
revealed "no evidence for a rotator cuff tear," but the
"axillary pouch appeared slightly small, which could be seen in
adhesive capsulitis." (Tr. 433). On October 13, 2010, Dr.

7

Toczylowski reported that plaintiff's updated MRI results showed "some contracture of the inferior aspect consistent with a capsulitis." (Tr. 444).  It was noted that plaintiff's ROM was limited to 4+/5 strength and that plaintiff was "diffusely tender about the shoulder." (Tr. 444).  Dr. Toczylowski recommended plaintiff attend six weeks of PT to increase ROM and strength.  (Tr. 444).

Plaintiff returned to Dr. Toczylowski on March 9, 2011, complaining of tenderness and decreased ROM in the right shoulder.  (Tr. 442).  Once again, plaintiff demonstrated 4+/5 strength with no evidence of instability.  (Tr. 442). Plaintiff, however, only had the ability to forward flex the shoulder and was "diffusely tender over the anterior aspect of his shoulder joint." (Tr. 442).  During this visit, Dr. Toczylowski advised plaintiff that he had adhesive capsulitis, also known as frozen shoulder, and recommended an intraarticular cortisone injection followed by PT.  (Tr. 442).

An April 13, 2011 arthrography of the shoulder showed "no evidence of [a] rotator cuff tear." (Tr. 432, 454, 497).  On April 25, 2011, Dr. Toczylowski noted that plaintiff had only 4+/5 strength and demonstrated discomfort with the end ROM. (Tr. 440).  Thereafter, Dr. Toczylowski started plaintiff on a trial of Arthrotec.  ("Tr. 440).  On August 29, 2011, Dr. Toczylowski, noted that plaintiff demonstrated "significant

discomfort" and had 4+ or -/5 strength, but was without evidence of instability. (Tr. 438). During another visit on November 30, 2011, Dr. Toczylowski noted that plaintiff could only lift weights of five to ten pounds. (Tr. 672). Plaintiff could not, however, lift five pounds at shoulder level, "especially with the arm extended in front of him." (Tr. 672). Plaintiff did have 4+/5 strength. (Tr. 673).

During a physical examination on January 16, 2012, Dr. Toczylowski recorded that plaintiff had good ROM overall. (Tr. 670). Plaintiff only had trouble with a "catching sensation," which caused plaintiff to wince and grab the extremity when lowering his arm. (Tr. 670). Plaintiff exhibited 4+/5 strength upon testing. (Tr. 670). On May 2, 2012, Dr. Toczylowski noted that plaintiff exhibited signs of being in pain and had less than full strength on physical exam. (Tr. 668). Dr. Toczylowski also stated that plaintiff had reasonable overall ROM but was "significantly limited" due to weakness. (Tr. 668).

On July 2, 2012, Dr. Toczylowski noted that plaintiff was a candidate for an EMG and nerve conduction study to determine if the neurologic problem was "radicular or related to the radial nerve at the elbow." (Tr. 530). Although on physical examination plaintiff reported moderate to severe shoulder pain, plaintiff demonstrated good ROM with diffuse tenderness. (Tr. 530). When plaintiff returned to Dr. Toczylowski on August 7,

2012, he complained of "significant difficulty in his shoulder." (Tr. 528). It was noted, however, that plaintiff had overall good ROM and 4+/5 strength. (Tr. 528). Dr. Toczylowski felt plaintiff was a good candidate for arthroscopic surgery to determine why the problems with his right shoulder persisted. (Tr. 528).

Plaintiff visited Dr. Toczylowski on July 22, 2013, after his second surgery to report his frustration with the Titanium implant in his shoulder. (Tr. 526). Dr. Toczylowski's report indicated that plaintiff had received multiple MRI's to date, which had not shown marked abnormality in the right shoulder. (Tr. 526). Despite this, Dr. Toczylowski reported that plaintiff's shoulder failed to "work efficiently." (Tr. 526).

Imaging of plaintiff's shoulder on October 30, 2013 revealed the following: (1) "postoperative changes to the supraspinatus tendon with intact repair"; (2) "mild medial subluxation long head biceps tendon with external rotation, and a concomitant undersurface tear of the distal subscapularis fibers"; and (3) a "moderate distention subacromial subdeltoid bursa." (Tr. 803). On November 18, 2013, Dr. Toczylowski noted that the "subluxation of the biceps as the etiology of [plaintiff's] symptoms." (Tr. 524). Although plaintiff again complained of a catching sensation in his shoulder, Dr.

Toczylowski reported that plaintiff had "good external rotation with 4+/5 strength."  (Tr. 524-25).

Dr. Toczylowski informed plaintiff on April 1, 2014 that he was a candidate for "arthroscopy with assessment of his intra articular structures and rotator cuff as well as his biceps." (Tr. 904).  During this visit, Dr. Toczylowski noted that plaintiff had overall good external rotation with 4+/5 strength. (Tr. 905).  Dr. Toczylowski also reported that plaintiff had an occasional "popping and snapping sensation" as he moved his shoulder.  (Tr. 905).  Plaintiff was also "tender over the area of the biceps."  (Tr. 905).  On June 12, 2014, Dr. Toczylowski performed an arthroscopy of plaintiff's shoulder and a bicep tenodesis.  (Tr. 795).  Plaintiff's first post-operative visit with Dr. Toczylowski on June 23, 2014 revealed plaintiff had limited external rotation and abduction across the chest but had good extension and flexion.  (Tr. 906).  Plaintiff reported feeling well post-operation.  (Tr. 906).

On July 1, 2014, Dr. Toczylowski reported that plaintiff appeared to have "broken through the cortex" and probably ruptured a tendon.  (Tr. 908).  Dr. Toczylowski informed plaintiff that he was a candidate for re-insertion and re-tenodesis of the shoulder.  (Tr. 908).  On July 17, 2014, Dr. Toczylowski performed exploration surgery of the anterior shoulder with lysis of adhesions in the right shoulder.  (Tr.

11

787).  Plaintiff was reasonably well during a post-operative
visit on July 28, 2014, and exhibited good external rotation.
(Tr. 911-912).  On physical examination by Dr. Toczylowski on
September 8, 2014, plaintiff showed limited external rotation.
(Tr. 913).  He demonstrated 4+/5 strength but had some
tenderness over the biceps.  (Tr. 913).  Despite this, Dr.
Toczylowski reported that plaintiff "overall had reasonable
strength."  (Tr. 913).

On November 14, 2014, plaintiff visited Compass Medical
Easton Family Medicine ("CMEFM") with disability paperwork.
(Tr. 891).  Plaintiff complained of continued pain in his right
shoulder.  It was reported that plaintiff was "unable to use the
shoulder for lifting or stability due to pain and lack of both
ROM and strength."  (Tr. 891).  On physical examination at
CMEFM, David Cunningham, M.D. ("Dr. Cunningham") noted that
plaintiff's right shoulder had "reduced ROM [with] an inability
to actively extend to abduct past 90 degrees."  (Tr. 893).  Dr.
Cunningham reported similar findings regarding plaintiff's
shoulder on November 19, 2014.  (Tr. 816).  On December 3, 2014,
Dr. Toczylowski examined plaintiff and found that plaintiff's
"sensation was diminished about the area of his delta pectoral
incision."  (Tr. 916).  Despite this, however, plaintiff
exhibited 4+/5 strength.  (Tr. 916).

On February 26, 2015, plaintiff met with orthopedic surgeon
Michael Ackland, M.D. ("Dr. Ackland") at New England Baptist
Hospital.  (Tr. 949-50).  Upon a physical examination, Dr.
Ackland noted that plaintiff had a painful ROM along with
limited abduction and flexion.  (Tr. 950).  Dr. Ackland reported
that plaintiff exhibited tenderness in the "acromioclavicular
joint" and +4/5 strength.  (Tr. 950).  Dr. Ackland made similar
findings following an examination of plaintiff on November 24,
2015, and recommended "a right shoulder labral debridement
versus a repair revision."  (Tr. 945).  After an MRI of his
shoulder on August 20, 2015, plaintiff returned to Dr. Ackland's
office.  (Tr. 947).  Dr. Ackland noted that plaintiff had
developed a "Popeye deformity" and had significant increased
pain in the shoulder.  (Tr. 947).  Dr. Ackland also reported
that plaintiff's Kennedy-Hawkins impingement test, apprehension
test, and O'Brien's test for joint labral tears were positive.
(Tr. 947).  Plaintiff's drop-arm test, used to assess for
rotator cuff tears, was negative.  (Tr. 947).

III.  Opinion Evidence

A.  Gilbert Shapiro, M.D.

On September 9, 2011, Gilbert Shapiro, M.D. ("Dr.
Gilbert"), a board certified orthopedic surgeon, performed an
independent medical examination of plaintiff.  (Tr. 452-456).
Upon physical examination, Dr. Gilbert was asked to comment on

13

whether plaintiff had "reached maximum medical improvement."
(Tr. 455).  Dr. Gilbert opined that plaintiff had in fact
"reached maximum medical improvement."  (Tr. 455).  Dr. Gilbert
observed expressions of pain during movement and a diminished
ROM compared to earlier evaluations.  (Tr. 455).  Dr. Gilbert
concluded this outcome to be more likely a "subjective response
and [a] lack of cooperation [rather] than an active adhesive
capsulitis."[6]  (Tr. 455-456).

B.  Dr. Toczylowski

On December 1, 2011, Dr. Toczylowski provided a narrative
assessment, which set forth his conclusions regarding
plaintiff's ability to function.  (Tr. 512-517).  Dr.
Toczylowski detailed the course of plaintiff's shoulder
treatment and concluded that plaintiff's "disability is felt to
be permanent in nature."  (Tr. 517).  Dr. Toczylowski further
opined that plaintiff's "disability will continue for an
indefinite period of time that is likely to never end even
though a recovery at some remote unknown time is possible."
(Tr. 516).  He cited that plaintiff had the ability to lift only
five to ten pounds with his right arm.  (Tr. 515).  It was also

---

[6]  Adhesive capsulitis may be colloquially expressed as a "frozen
shoulder."  See Blakiston's Gould Medical Dictionary (4th ed.
1979).

noted that plaintiff was unable to lift more than five pounds with his arm extended in front of him.  (Tr. 515).

C.  Hillel Skoff, M.D.

On March 14, 2012, Hillel Skoff, M.D. ("Dr. Skoff")[7] from the Department of Industrial Accidents provided a narrative opinion regarding plaintiff's disability.  (Tr. 519-522).  After an examination of plaintiff, Dr. Skoff reported findings regarding plaintiff's "catching" sensation and ROM.  (Tr. 976). He agreed with Dr. Toczylowski's findings concerning plaintiff's ability to lift weight.  (Tr. 522).  Dr. Skoff opined that it was not possible for plaintiff to continue to work as a truck driver.  (Tr. 522).  Dr. Skoff further concluded that, based on his review of truck driving job descriptions and his experience with patients in similar situations, plaintiff had the capability to fulfill the duties of a truck driver on a smaller scale.  (Tr. 522).  Although Dr. Skoff believed that plaintiff was "temporarily totally disabled for six months during his employment," he concluded that plaintiff was 20 percent disabled in his upper extremity and 12 percent wholly disabled.  (Tr. 522).

D.  Kirby VonKessler, M.D.

---

[7]  Dr. Skoff is a hand, wrist, elbow and shoulder specialist. (Tr. 519).

On April 24, 2014, state agency consultant, Kirby VonKessler, M.D. ("Dr. VonKessler"), completed a residual functional capacity ("RFC") assessment. (Tr. 124-25). Dr. VonKessler opined that plaintiff could lift 20 pounds occasionally and ten pounds frequently. (Tr. 125). Dr. VonKessler further noted that plaintiff could stand and walk for "about 6 hours in an 8-hour workday." (Tr. 125). Dr. VonKessler believed plaintiff had no limitations on pushing and pulling. (Tr. 125). Dr. VonKessler concluded that plaintiff had limited ability to reach overhead, laterally, and in front with his right side. (Tr. 125). It was noted that plaintiff had "light RFC with restrictions" but that plaintiff could do other work. (Tr. 126). Based on plaintiff's medical records, Dr. VonKessler reported that plaintiff was not disabled. (Tr. 127).

E.  Richard Goulding, M.D.

On October 24, 2014, state agency consultant, Richard Goulding, M.D. ("Dr. Goulding"), provided an additional RFC assessment that supported Dr. VonKessler's opinions. (Tr. 138-40). Dr. Goulding, however, added that plaintiff had limited ability to push or pull with the right upper extremity. (Tr. 139). Dr. Goulding noted that plaintiff's medical records indicated that plaintiff's rotator cuff was intact with "subluxing biceps." (Tr. 139). Other medical records stated

16

that plaintiff had good strength.   (Tr. 139).   Finally, Dr.
Goulding noted that plaintiff drives, uses the computer, and
reads.   (Tr. 140).   Although plaintiff alleges he has
fibromyalgia and difficult walking, there is no medical record
to corroborate this.   (Tr. 140).   Based on the medical records,
Dr. Goulding opined that plaintiff had "light RFC [but] with
restrictions [plaintiff] could do other work."   (Tr. 140).   Dr.
Goulding ultimately determined plaintiff was "not disabled."
(Tr. 141).

F.   Dr. Cunningham

On February 4, 2016, Dr. Cunningham from Compass Medical
completed a treating source statement.   (Tr. 963-66).   Dr.
Cunningham believed that plaintiff could rarely lift ten pounds.
(Tr. 965).   Dr. Cunningham stated that plaintiff could only
grasp, turn/twist objects, perform fine manipulations, and reach
in front or overhead for approximately ten percent of the
workday.   (Tr. 965).   Finally, Dr. Cunningham opined that
plaintiff was incapable of even "low stress work."   (Tr. 966).

G.   Michael Ackland, M.D.

On February 17, 2016, Dr. Ackland provided a medical source
statement.   (Tr. 959-62).   He diagnosed plaintiff with a "right
shoulder impingement" and "SLAP tear."   (Tr. 959).   According to
Dr. Ackland, plaintiff's MRI showed a labral tear.   (Tr. 959).
Dr. Ackland believed that plaintiff had no restrictions in his

ability to sit, stand, walk, twist, stoop/bend, crouch/squat,
climb stairs or climb ladders. (Tr. 960-61). Furthermore, Dr.
Ackland stated plaintiff would occasionally be limited to
lifting less than ten pounds. (Tr. 961). Finally, Dr. Ackland
opined plaintiff would be limited to using his hands for
grasping, turning, or twisting objects 25% of the time, and
using his fingers for fine manipulations 50% of the time. (Tr.
961).

IV.  ALJ Hearing

During the May 24, 2016 hearing, the ALJ heard testimony
from both plaintiff and the VE. (Docket Entry # 1-1, Tr. 19).
Plaintiff testified that he previously worked as a truck driver
for Mobile Mini, Inc., but stopped working in 2009 when he was
laid off and his body would not allow him to work anymore. (Tr.
58). Plaintiff indicated that he was unable to use his right
arm. (Tr. 60). Plaintiff further noted that he suffered from
anxiety. (Tr. 60).

After undergoing multiple shoulder and bicep surgeries,
plaintiff testified that he could not perform even the most
basic tasks. (Tr. 64-65). According to plaintiff, anything
that involved flexing or tightening of the bicep resulted in a
"burning spasm." (Tr. 65). When asked, however, plaintiff
admitted that he was able to drive. (Tr. 65). Plaintiff stated
that the right arm always stayed "by his side" when driving

18

because it was too painful to use.  (Tr. 65).  Plaintiff testified that, if he ever used his right arm, he experienced "throbbing pain at night."  (Tr. 66).

Plaintiff further testified that he used to avidly lift weights when he was a bodybuilder.  (Tr. 67).  As a bodybuilder, plaintiff experienced some shoulder problems and had an arthroscopy on the left side.  (Tr. 67).  Plaintiff noted that he cannot exercise anymore due to the injury to his right shoulder and was in "horrible physical shape."  (Tr. 68).

Following his shoulder injury, plaintiff's girlfriend drives him where he needs to go because he is too nervous to drive.  (Tr. 70).  Plaintiff's girlfriend also does the grocery shopping.  (Tr. 70).  Plaintiff stated that he was living a "very poor quality life," and has become very dysfunctional and anxious.  (Tr. 70).  As a result, plaintiff started seeing a therapist at Taunton Behavioral Services and began having panic attacks before attending his scheduled therapy visits.  (Tr. 70-71).

In a typical day, plaintiff tries to find things to keep him busy.  (Tr. 83).  Plaintiff spends the majority of his time reading about his condition to see what he can do to improve.  (Tr. 83).  Plaintiff testified that he is unable to perform any activity with his arm reached out in front or overhead.  (Tr. 86).  Plaintiff also claimed that he does not have the ability

19

to pay attention, focus, or concentrate.  (Tr. 86).  Finally,

plaintiff testified that he does not sleep well due to restless

leg syndrome.  (Tr. 86).

During the hearing, the ALJ proposed a hypothetical to the

VE.  (Tr. 90).  In particular, the ALJ posed the following

hypothetical question:

> Now assume if you will that a hypothetical person is of the
> same age, education, language, and work background as the
> Claimant.  Further assume that if there's work that such a
> person could perform it would be subject to the following
> limitations.  This person would be able to lift and carry
> 20 pounds on an occasional basis and lift and carry 10
> pounds on a frequent basis.  This person would have to use
> the left arm for doing the lifting and carrying of any
> objects.
>
> However, this person would be able to sometimes support the
> left arm with the right arm but certainly not to the point
> where the right arm would be lifting and carrying and the
> right arm would have to be raised vertically beyond . . .
> the shoulder level.  This person would be able to sit for
> six hours in an eight-hour workday, stand and/or walk for
> six hours in an eight-hour workday.
>
> This person would be unable to reach vertically with the
> right upper extremity, would occasionally be able to reach
> horizontally with the right upper extremity and would be
> unable to push and pull with the right, upper extremity.
> This person is a right handed individual . . . and those
> would be the limitations.  Would such a person be able to
> perform any work in the regional or national economy?

(Tr. 90).  The VE answered that such an individual could perform

work in the regional or national economy.  (Tr. 91).  The VE

also provided numerous examples of jobs in the labor force in

which this hypothetical person could work.  (Tr. 91).

The ALJ then posed a second hypothetical:

Assume if you will that our second hypothetical person has
the following limitations.  This person would occasionally
be able to lift less than 10 pounds, . . . would be able to
lift and carry less than 10 pounds on an occasional basis.
This person would be able to use the right upper extremity
50 percent of the time for fine manipulation, 25 percent of
the time for gross manipulation and would be off task 25
percent or more, would be capable of low stress work, would
– those would be the limitations.  Would such a person be
able to perform any work in the regional or national
economy?

(Tr. 92).  The VE answered that such a person could not.  (Tr.

92).  The VE explained that, from his experience, and

particularly with the 25 percent off-task consideration, while

certain expectations are made by employers, such a person could

not be sufficiently competitive and productive in the work

force.  (Tr. 92).

## DISCUSSION

I.   Jurisdiction and Standard of Review

This court has the power to affirm, modify, or reverse the

ALJ's decision with or without remanding the case for a hearing.

42 U.S.C. § 405(g).  The ALJ's findings are conclusive if

supported by substantial evidence.  See Richardson v. Perales,

402 U.S. 389, 390 (1971); Seavey v. Barnhart, 276 F.3d 1, 9 (1st

Cir. 2001); Manso-Pizarro v. Secretary of Health and Human

Services, 76 F.3d 15, 16 (1st Cir. 1996).  The ALJ's findings of

fact are not conclusive when they are "derived by ignoring

evidence, misapplying the law, or judging matters entrusted to

21

experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).
It is this court's task to determine "whether the final decision
is supported by substantial evidence and whether the correct
legal standard was used." Seavey, 276 F.3d at 9.

"[T]he determination of the ultimate question of
disability" and determinations regarding conflicts in the
evidence and issues of credibility are for the ALJ, not the
courts. Rodriguez v. Secretary of Health and Human Services,
647 F.2d 218, 222 (1st Cir. 1981); see also Seavey, 276 F.3d at
9. Even if the record arguably justifies a different
conclusion, this court must affirm the ALJ's decision if it is
supported by substantial evidence. Pagan v. Secretary of Health
and Human Services, 819 F.2d 1, 2 (1st Cir. 1987). Substantial
evidence exists if, "reviewing the evidence in the record as a
whole," a reasonable mind "could accept it as adequate to
support the Commissioner's conclusion." Rodriguez, 647 F.2d at
222; accord Musto v. Halter, 135 F. Supp. 2d 220, 225 (D. Mass.
2001) (internal quotation marks and citations omitted).

## II. Disability Determination

The Social Security Act defines a disability as the:

[I]nability to engage in any substantial gainful activity
by reason of any medically determinable physical or mental
impairment which can be expected to result in death or has
lasted or can be expected to last for a continuous period
of not less than 12 months.

22

42 U.S.C. § 423(d)(1)(A).  The impairment must be of such
severity that the claimant "'is not only unable to do his
previous work but cannot, considering his age, education and
work experience, engage in any other kind of substantial work
which exists in the national economy.'"  Deblois v. Secretary of
Health and Human Services, 686 F.2d 76, 79 (1st Cir. 1982)
(quoting 42 U.S.C. § 423(d)(2)(A)).

      To determine whether a claimant is disabled within the
meaning of the statute, the Social Security Administration
("SSA") applies a five-step evaluation process and considers all
of the evidence in the claimant's case record.  20 C.F.R. §§
404.1520; see Goodermote v. Secretary of Health and Human
Services, 690 F.2d 5, 6 (1st Cir. 1982).  In the first step, the
claimant is not disabled if he or she is currently employed.
Goodermote, 690 F.2d at 6.  If the claimant is not employed, the
decision maker proceeds to the second step to evaluate if the
claimant has a severe impairment or combination of impairments.
Id.  If the claimant is not found to have a severe impairment or
combination of impairments, then the claimant is not disabled.
See id. at 7.  If the claimant has a severe impairment or
combination of impairments, then the analysis proceeds to the
third step.

      At step three, the ALJ determines if the claimant's severe
impairment or combination of impairments meets or is medically

equivalent to one of the listed impairments in Appendix 1, Subpart P, Part 404 of the Code of Federal Regulations.  20 C.F.R. §§ 404.1520(a)(4); <u>see</u> <u>also</u> <u>Goodermote</u>, 690 F.2d at 7. If the impairment or a combination of impairments meets, or medically equals, a listed impairment then the claimant is deemed disabled.  If not, the analysis proceeds to step four. <u>See</u> <u>Goodermote</u>, 690 F.2d at 7.

At step four, the ALJ must determine if the claimant can perform any of his or her past relevant work.[8]  20 C.F.R. 404.1520(a)(4).  The claimant's current RFC must be compared with the mental and physical demands of the claimant's past work.  <u>Manso-Pizarro</u>, 76 F.3d at 17.  If the claimant can perform any of his or her past relevant work, the claimant is not disabled.  <u>See</u> <u>Goodermote</u>, 690 F.2d at 7.

In the first four steps, the burden to provide evidence and to prove an inability to perform past work rests with the claimant.  <u>See</u> <u>Manso-Pizarro</u>, 76 F.3d at 17; <u>see</u> <u>also</u> <u>Freeman v.</u> <u>Barnhart</u>, 274 F.3d 606, 608 (1st Cir. 2001) ("applicant has the burden of production and proof at the first four steps of the process").  If the claimant successfully satisfies this burden by showing he can no longer perform his past work, the burden

---

[8]  Past relevant work is any substantial gainful activity "lasting long enough for you to learn how to do it" done in the past 15 years.  20 C.F.R. § 404.1560; Social Security Ruling 82-62, 1982 WL 31386 (Jan. 1, 1982).

shifts to the Commissioner to show the existence of a
significant number of jobs in the national economy that the
claimant could perform.  20 C.F.R. §§ 404.1560(g); <u>Bowen v.
Yuckert</u>, 482 U.S. 137, 146 n.5 (1987); <u>Goodermote</u>, 690 F.2d at
7; <u>Rosado v. Secretary of Health and Human Services</u>, 807 F.2d
292, 294 (1st Cir. 1986).  In making this determination at step
five, the decision maker must consider the claimant's RFC, age,
education and work experience.  <u>See</u> 20 C.F.R. §§ 404.1520(g).
The claimant is not disabled if jobs the claimant can perform
exist in significant numbers in the national economy.  <u>See</u> 20
C.F.R. §§ 404.1520.

III.   <u>ALJ's Decision</u>

      The ALJ determined that plaintiff "last met the insured
status requirements of the Social Security Act on December 31,
2014."  (Tr. 24).  The ALJ proceeded to go through the five-step
evaluation process to determine if plaintiff was eligible for
disability benefits.  (Tr. 25-41).  At step one, the ALJ found
plaintiff had not engaged "in substantial gainful activity
during the period from his alleged onset date of August 30,
2009."  (Tr. 24).  At step two, the ALJ found plaintiff suffered
the following severe impairments:  "right rotator cuff tear,
status post-surgical repairs in 2007 and 2008; status post-two
right biceps tenodesis for subluxation biceps with labral

fraying and a subacromial bursectomy; fibromyalgia and asthma."
(Tr. 24).

At step three, the ALJ found plaintiff did not "have an
impairment or combination of impairments that met or medically
equaled the severity of one of the listed impairments in 20
C.F.R. Part 404, Subpart P, Appendix 1." (Tr. 31). In making
this finding, the ALJ considered whether the severity of
plaintiff's impairments satisfied the four broad functional
areas set out in the disability regulations for evaluating
mental disorders ("paragraph B criteria"). (Tr. 30).

First, the ALJ found plaintiff has only mild limitation
with regard to "activities of daily living." (Tr. 30). The ALJ
noted that plaintiff had no problems with personal care and was
capable of making his own meals and performing personal hygiene.
(Tr. 30). Despite plaintiff's claims that he experienced
trouble dressing, bathing, and toileting because of his right
shoulder, the ALJ determined that plaintiff only had a mild
restriction in his "activities of daily living." (Tr. 30).

Second, the ALJ determined plaintiff experienced mild
limitation with regard to social functioning. (Tr. 30). The
ALJ also determined that there was "little objective evidence to
support the claimant's alleged social limitations. (Tr. 30).
Specifically, the ALJ reasoned that plaintiff's ability to
attend a fun park "directly contradict[ed] his allegations of

26

isolation and social anxiety." (Tr. 30).  According to the ALJ,
plaintiff was able to work despite his anxiety.  (Tr. 30).

Third, the ALJ determined plaintiff had mild difficulties
with concentration.  (Tr. 30).  Plaintiff had informed Dr.
Hennessy that he was able to multi-task, but admitted that his
concentration, attention, pace and focus were "slow and poor."
(Tr. 30-31).  On testing, however, plaintiff's ability to focus
and concentrate were within normal limits.  (Tr. 31).
Therefore, the ALJ reasoned that there was no evidence that
plaintiff had any significant problem maintaining his
concentration, persistence, or pace.  (Tr. 31).  Fourth, the ALJ
noted that plaintiff experienced no episodes of decompensation.
(Tr. 31).  In these conclusions, the ALJ determined that
plaintiff's mental impairments caused no more than "'mild'
limitations."  (Tr. 31).

At step four, the ALJ found plaintiff did not have any
impairments that "met or medically equaled the severity of one
of the listed impartments in 20 C.F.R. Part 404, Subpart P,
Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526)."
(Tr. 40).  At step five, the ALJ determined that plaintiff had
the RFC to perform light work as defined by 20 Code of Federal
Regulations 404.1567(b) with the exception that lifting or
carrying be limited to his left arm.  (Tr. 31).  The ALJ found
that plaintiff could occasionally reach horizontally but not

vertically and could not push or pull with the right arm.  (Tr.
31).  Finally, the ALJ determined that plaintiff could perform
"gross manipulation for 25% of the workday and fine manipulation
for 50% of the workday." (Tr. 31).  Despite plaintiff's claim
that he strapped his right arm to his side, the ALJ found that
there was no evidence to support this claim.  (Tr. 32).

     In reaching his decision, the ALJ afforded "significant"
weight to the December 1, 2011 opinion of Dr. Toczylowski.  (Tr.
39).  In his opinion, as recounted by the ALJ, Dr. Toczylowski
noted that plaintiff was unable to "use his upper extremity for
repetitive or overhead activities." (Tr. 39).  It was also
noted that plaintiff "could lift only 5-10 pounds, and only 5
pounds up to and above his shoulder." (Tr. 39).  Dr.
Toczylowski stated that plaintiff could not "use a hand truck,
operate a 10-speed gearshift or use his right arm to steer while
leaning out the window." (Tr. 39).  According to Dr.
Toczylowski, plaintiff could stand, go up and down stairs, and
bend at the knees and waist.  (Tr. 39).  The ALJ, however, did
not agree with Dr. Toczylowski's opinion that plaintiff was
unable to kneel, climb, or crawl based on the injury to his
right upper extremity.  (Tr. 39).

     The ALJ afforded "great weight" to the findings, opinions,
and assessments of Dr. Shapiro, Dr. Skoff, Dr. VonKessler, and
Dr. Goulding.  (Tr. 39-40).  Dr. Shapiro opined that plaintiff

could sit, stand, walk, bend, and use his left arm. (Tr. 39).
Meanwhile, Dr. Skoff opined that plaintiff "remained disabled
from returning to his prior occupation because of the loading
requirement." (Tr. 39). According to Dr. VonKessler and Dr.
Goulding, plaintiff was able to perform "light work with
limitations on the use of his right upper extremity." (Tr. 40).

The ALJ afforded "little weight" to the multiple records of
Dr. Ackland and the "Physical Medical Source Statement"
completed by Dr. Cunningham. (Tr. 39). Specifically, the ALJ
found that Dr. Ackland did not provide any rationale for his
statement that plaintiff would be "off task 25% or more of the
workday and unable to work full-time." (Tr. 39). Dr.
Cunningham's report that plaintiff suffered from "moderate to
severe pain in the knees, shoulders, upper back and calves" was
also not supported by any evidence. (Tr. 40). Furthermore, Dr.
Cunningham did not explain the "limitations in the claimant's
ability to sit, stand walk, lift carry and perform other
physical maneuvers." (Tr. 40) Accordingly, the ALJ determined
that plaintiff was not disabled for the purposes of disability
benefits. (Tr. 41).

IV. Plaintiff's Arguments

In seeking to reverse the Commissioner's decision,
plaintiff contends that the ALJ failed to properly weigh the
medical opinion evidence in the determination of the RFC.

(Docket Entry # 14).  Plaintiff submits that the ALJ erred in
his evaluation of the opinion evidence used to determine
plaintiff's RFC, asserting that the ALJ improperly weighed Dr.
Toczylowski's opinion pursuant to the treating physician rule.
(Docket Entry # 14).  Specifically, plaintiff alleges two
errors:  (1) the ALJ did not accurately interpret plaintiff's
lifting restriction; and (2) the ALJ did not provide an
explanation for rejecting the limitations of kneeling, crawling,
and climbing.  (Docket Entry # 14).  The Commissioner maintains
the ALJ appropriately weighed the medical opinion evidence in
his determination of plaintiff's RFC.  (Docket Entry # 18).

A.   Lifting Restriction

The Commissioner acknowledges that the ALJ inaccurately
summarized Dr. Toczylowski's opinion with regard to plaintiff's
ability to lift five pounds above his shoulder.  (Docket Entry #
18).  The ALJ, however, relied on the RFC and the hypothetical
posed to the VE, which remained consistent with Dr.
Toczylowski's opinion.  (Docket Entry # 18).  The RFC included
plaintiff's inability to lift weight with his right arm at all.
(Docket Entry # 18).  Based on the RFC, the ALJ determined that
plaintiff's right arm "could only be used to support up to
shoulder level, but no higher."  (Docket Entry # 18).
Furthermore, the hypothetical posed to the VE was an accurate

depiction of Dr. Toczylowski's medical opinion.  (Docket Entry # 18).

Accordingly, any error made by the ALJ in this matter was not detrimental to plaintiff.  See, e.g., Slimane v. Astrue, Civil Action No. 11-10058-RWZ, 2012 WL 1836371 (D. Mass. May 17, 2012).  "[E]ven if the ALJ mischaracterize[s] their opinions, such error [is] not prejudicial because it [does] not affect the ALJ's ultimate disability determination."  Id. at *7.  In fact, mistakes by administrative agencies do "not mechanically compel reversal . . . [when it is] one that clearly had no bearing on the procedure used or the substance of the decision reached."  Kurzon v. U.S. Postal Serv., 539 F.2d 788, 796 (1st Cir. 1976). The VE answered the hypothetical posed to him based on the ALJ's RFC, which noted that plaintiff could not lift at all with his right arm.  (Docket Entry # 18).  Therefore, the ALJ properly accounted for the lifting restriction that Dr. Toczylowski noted.

B.  Ability to Kneel, Climb, or Crawl

The ALJ did not give weight to Dr. Toczylowski's opinion that plaintiff could not kneel, climb, or crawl due to pain in his right upper extremity because there was no basis or support provided for this opinion.  (Tr. 438-451, 512-517, 524-531, 899-916).  The ALJ is required to provide "good reason" for the weight given to a treating physician based on factors outlined

31

in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6).  20 C.F.R. §

404.1527(c)(2).[9]  Although it is preferable for the ALJ to

explicitly detail his findings, it is not required.  See Green

v. Astrue, 588 F. Supp. 2d 147 (D. Mass. 2008) ("It would be a

waste of judicial resources to remand this case so that another

[ALJ] may arrive at the same decision with more clarity").

Substantial evidence can therefore support the ALJ's findings if

the ALJ's reasoning and decision are sufficiently clear.  Id. at

155.  Any errors by the ALJ may be harmless if the reasons for

rejecting a limitation can be gleaned from the ALJ's discussion

of the record.  Dorego v. Astrue, Civil Action No. 10-11768-DPW,

2012 WL 603196, at *11 (D. Mass. Feb. 24, 2012).

    The ALJ's decision explicitly stated that the records

provided by Dr. Toczylowski did not support a complete inability

to use his right arm.  (Tr. 39).  In fact, Dr. Toczylowski noted

that plaintiff maintained good strength.  (Tr. 33, 440, 447,

450).  The ALJ also noted that none of the other medical

opinions or records indicated that plaintiff had limited ability

to kneel, climb, or crawl.  "Generally, the more consistent a

medical opinion is with the record as a whole, the more weight

we will give to that medical opinion."  Keating v. Sec'y of

---

[9]  The Commissioner issued new regulations regarding the
evaluation of opinion evidence.  These new regulations, however,
are only applicable in cases where the application was filed on
or after March 27, 2017.  See 20 C.F.R. § 404.1520(c).

Health & Human Servs., 848 F.2d 271, 276 (1st Cir. 1988) (noting that ALJ is free to discount medical opinions based on contradictory medical evidence); Smith v. Astrue, 717 F. Supp. 2d 164, 172 (D. Mass. 2010) (ALJ may discount opinions that are conclusory and inconsistent with other substantial evidence).

The ALJ gave great weight to the opinions of Dr. Shapiro, Dr. Skoff, Dr. VonKessler, and Dr. Goulding, none of whom noted that plaintiff could not kneel, climb, or crawl. (Tr. 125, 129, 452-56, 519-22, 959-962, 968-72). Specifically, Dr. Shapiro's 2015 opinion stated that plaintiff was able to bend, squat, climb, kneel, and crawl in an eight-hour workday. (Tr. 972). Both Dr. VonKessler and Dr. Goulding opined that plaintiff had no postural limitations. (Tr. 125, 129). It is the ALJ's job to determine the weight of conflicting medical opinions. See, e.g., Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 12 (1st Cir. 1982) ("conflict between the personal physician and the medical advisor was for the [Commissioner] to resolve"). Here, the ALJ considered Dr. Toczylowski's opinions and, given the breadth of contradictory evidence, disregarded Dr. Toczylowski's opinion regarding plaintiff's ability to kneel, climb, or crawl.

Finally, any error made by the ALJ was harmless because the VE identified jobs that would not require plaintiff to kneel, crawl, or climb. See Kolek v. Colvin, Civil Action No. 13-

33

30156-MAP, 2014 WL 6893554, at *2 (D. Mass. Dec. 5, 2014)

(finding no reversible error where the jobs VE identified did

not involve the omitted function).   "While an error of law by

the ALJ may necessitate a remand, a remand is not essential if

it will amount to no more than an empty exercise." Ward v.

Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000).   Here,

the VE identified that plaintiff could work as a security guard,

companion, and flagger.[10]   None of these jobs requires kneeling,

crawling, or climbing.   Thus, even if the ALJ had provided a

limitation for kneeling, climbing, or crawling, the VE could

have identified the same jobs.

CONCLUSION

In accordance with the foregoing discussion, this court

**RECOMMENDS**[11] that plaintiff's motion for an order reversing the

---

[10]   DOT defines "Security Guard" as a watch guard who performs
patrols, periodically, buildings and grounds, but does not
specifically involve kneeling, climbing, or crawling.   DOT
372.667-034.   DOT defines "Companion" as someone who cares for
the elderly but does not specifically involve kneeling,
climbing, or crawling.   DOT 309.677-010.   DOT defines "Flagger"
as someone who signals with a flag at the start of a race but
does not explicitly involve kneeling, climbing, or crawling.
DOT 372.667-026.

[11]   Any objections to this Report and Recommendation must be
filed with the Clerk of Court within 14 days of receipt of the
Report and Recommendation to which objection is made and the
basis for such objection should be included.   See Fed. R. Civ.
P. 72(b).   Any party may respond to another party's objections
within 14 days after service of the objections.   Failure to file
objections within the specified time waives the right to appeal
the order.

decision of the Commissioner (Docket Entry # 13) be **DENIED** and the Commissioner's motion to affirm the Commissioner's decision (Docket Entry # 17) be **ALLOWED**.


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge